We're back in session. We'll now hear the argument in Hawaii Wildlife. You may proceed. Turning from copyright to sewage. Recycled water, Your Honor. Excuse me. Recycled water finding its way to the ocean. If it pleases the Court, my name is Mike Chabelski, along with Diana Martin. We represent the County of Maui. Also here with us today is Patrick Wong, Corporation Counsel for the County. Welcome, Mr. Wong. Your Honors, this appeal ultimately presents a narrow question of statutory interpretation. Namely, is the disposal of recycled water in the county's UIC wells a point source discharge of pollution that requires an NPDES permit? The answer to that question does not depend, of course, on what we might think in 2017 is good public policy or how we would have written the Clean Water Act had we been in Congress. The answer turns on what did Congress intend back in 1972 when it enacted the Clean Water Act. Your Honors, when you look at the text, the structure, and in particular the legislative history of the Act as a whole, only one answer is possible. Congress did not intend the NPDES program to apply to the disposal of pollutants in wells. In fact, Your Honors, the Clean Water Act itself explicitly identifies well disposal as non-point source pollution in Section 1314 F.D. of the Act. Could you deal with the Greater Yellowstone case in which the court found the Clean Water Act required a permit for water that entered a stormwater drain system and was then released into the ground and eventually surface water? Aren't the wells here analogous to the stormwater drain system in Greater Yellowstone? How would you distinguish? I would distinguish ultimately this comes down to a question of congressional intent. Congress was clearly presented during the debates in the Clean Water Act with the fact that polluted groundwater can affect surface water. Because of that, several amendments were proposed to extend NPDES permitting to groundwater discharges of wells. In fact, EPA itself explicitly came to Congress in 1972 as part of the debates and the EPA administrator asked for that authority to amend the Act and Congress denied it. Right, but counsel, I think it's important that we remember here that this Act was passed in 1972. We've learned a great deal and it's been left to the courts to try to figure out how to apply it as life goes on. And I understand that if the discharge is into a well and that's where it ends, then that's not covered. But the problem we have here, I'm just speaking for myself, is that the water doesn't always end there. It goes from the well, gets out and into navigable water. And that's something in different contexts that the courts have had to deal with since 1972. And so to say, well, it ends because this is called a well, doesn't seem to me quite to answer the questions before us, given the developments of the law since 1972. Your Honor, with respect, it should end because Congress made this decision. So it doesn't matter where the water goes. If it's a well, it's a well. Is that your position? Yes. It is clear from the legislative history, Congress understood that. And rejected it. As the Fifth Circuit's opinion and Exxon V. Train, looking at legislative history, clearly concluded, and there are two quotes from there that I think bear reading. The first was, quote, there is not the slightest hint that any member thought the bill would grant the administrator any power to regulate deep well disposal or any other form of groundwater pollution. Continuing in that opinion, the Fifth Circuit wrote, the legislative history demonstrates conclusively that Congress believed it was not granting the administrator any power to control disposals into groundwater. Making that a statement with respect to deep well. But it was controlling disposals into navigable waters. Into navigable waters. But again, we might debate the wisdom of the line Congress drew. But it is clear that under the Act, this construction doesn't defeat the purposes of the Act, Your Honor. Because it's clear Congress viewed that there were two ways surface waters would be protected. One, of course, is through the NPDES permit program. But the other co-equal program of equal weight to Congress for protecting surface water is the non-point source management programs under the states. The Clean Water Act requires states to adopt those programs. And if the affected water bodies are not meeting water quality, then to adopt total maximum daily loads that will limit both point source and non-point source contributions to those waters. It would be a violation of Congress's intent to say, well let's take away from the state non-point management program, pollution to groundwater via the wells. Because that was the choice Congress decided to do. So this is not, this construction does not create a regulatory gap. As I said, the Clean Water Act requires states to regulate this well disposal as a condition of NPDES permitting. And of course, there are any number of other federal and state statutes that will regulate the disposal of recycled water into these wells. So let me just go back to the statute as opposed to congressional intent. Because we get tied up in a lot of different views when we start looking at some of the congressional debates. So under the Clean Water Act, you need a point of emission that's readily identified, right? You need a point source, yes. You need a point source. A discernible, defined, and discrete advance. A defined, discernible point source, yes. And your view is that a well, by definition, is excluded from that, or no? You need a point source that is discharging to navigable water. If you had, see wells work two ways, Your Honor. Wells are often used to extract groundwater. Sure. And then you could have a discharge to navigable waters on the surface from the extracted groundwater. Sure. But when you are talking about disposal into underground deep well disposal, that is a non-point source pollution because it is going into groundwater. And Congress drew that distinction, and this court is duty-bound to respect it. Just as the Fifth Circuits and the Seventh Circuits, and I believe also the First Circuits, have recognized that distinction in the act. What do you do with the Tracer Dye Study? It confirmed that effluent from wells three and four enters the Pacific Ocean. As to wells one and two, the district court found, the county expressly conceded effluent from these wells enters the Pacific Ocean. How do you respond to the district court's decision as to wells one and two? On wells one and two, actually, Your Honor, I think the Tracer Study didn't detect. The Tracer Study wasn't on well one and didn't detect any emissions from well two. The Tracer Study was on three and four. Three and four. So that clarification of my response is. Either way, there's two wells. Two wells. Two wells that. It doesn't matter, Your Honor. Two wells that do and two wells that don't. Right. Because the emission from groundwater, the addition to the ocean of recycled water via the groundwater, is non-point source pollution. As the evidence in this record shows with respect to wells three and four, you have the groundwater seeping in, largely, 90-some percent through diffuse flow. You cannot identify the point in the ocean where the interface is occurring. And it's happening over a two-mile span. Okay. So let's change it. Here's the ocean. We'll use the Pacific Ocean just for ease of reference out here. Here's the ocean. Here's the well. Is that going to be covered? And there's a discharge here, but it's not yet in the ocean. I would call it immediately adjacent to the ocean. Covered or not covered? Well, it depends on the following, Your Honor. Okay. The definition of waters of the United States under the Act includes, for coastal waters, the tidally influenced zone. And so at the interface of the ocean water and the underground water, the tide's going to be affecting the groundwater there. So that could be classified as jurisdictional waters. Okay. We'll move it back a little. If you move it back, you're not in the tidal zone. Okay. We're going to move it back to where it can be jurisdictional. So now here's the ocean and here's the well. These are jurisdictional, you know, whatever, flatlands out there. It's outside of jurisdictional waters. Right. But it's just adjacent to it. The answer under the Act is that that is not a point source discharge. It would be non-point source pollution. That is how Congress envisioned the Act. This Court has made clear. So once you get – so in a way that you have all these other aspects of the Clean Water Act about transmission and navigable water, directly traceable, you would never get there. You would never walk through all of those. That is correct, Your Honor. Think about if this was happening on the surface. If you had surface runoff that wasn't collected or channeled and was spreading out over a two-mile range of parking lots and roads and things, that's classic non-point source pollution. The fact that that dispersal is happening underground doesn't change anything under the Act. In fact, this Court has made clear, starting with Trustees of Alaska and continuing all the way up to at least the ecological rights case in 2013, I believe it was, that how the pollutants get to navigable waters matters. That is the defining characteristic of the Clean Water Act. If it gets to the water through a point source as the outfall into the navigable water in PDS. Otherwise, it is non-point source pollution. Because if, in fact, Your Honor, you adopted the District Court's ruling here, you would effectively obliterate the distinction between point source and non-point solution because all pollution, virtually all pollution that is in non-point sources originates from a human-made or human-induced activity. And we might again say, well, that doesn't make sense anymore in light of what we now understand in 2017 about the control of pollution, but that is the choice Congress made. And the District Court's ruling will exponentially expand the Clean Water Act to disposal activities that have been understood for decades not to require a clean water permit. There are some 700,000 UIC wells in the country. Now you're arguing that all wells are going to be covered if we hold against you? No, ma'am. I'm arguing that there have been 700,000 at least UIC wells in the 45-year history of the Act. Before this opinion, not a single one has ever been required by the EPA or the states with permitting authority to require an NPDES permit. That has to be compelling evidence of what this Act means and how Congress drew that distinction. What is in that section that, in your view, excludes wells from the non-point source? It also talks about subsurface excavations. What's included in that phrase? Oh, Lord, Your Honor, I'm not completely sure. Well, we're here trying to construe the statute and like things are with like things. I'm kind of kind of. Well, I mean, everything that encompasses, I don't know. There's some that are obvious. Give me some examples. Drilling a mine shaft underground, the sort of horizontal drilling that might take place underground. That would be excavation that's occurring under the surface. They already have a section on mining activities, so since we assume that we're not superfluous, I'm just trying to understand what pollutants in wells or in subsurface excavations mean. Right. Well, again, there are a number of industrial activities that do excavate under the ground. But, of course, in this narrow context, we're dealing with the wells. And if I might, Your Honor, I want to address the 2,000-pound elephant in the case, the EPA's amicus brief, if I might. Now, after sitting on the sidelines for 40 years, knowing about these wells, knowing exactly what's going into these wells, and never requiring an NPDES permit for this activity, the EPA has profiled with you a brief claiming and demanding Chevron deference to this position they have that they describe as, well, at least requiring NPDES permit for a direct hydrologic connection. Your Honor, the government's brief is not entitled to Chevron deference. First, it's because there is no occasion for deference here. Congress's intent is clear. Congress has spoken to this issue. As, Judge Nelson, you wrote in the League of Wilderness versus Forest Green case, EPA lacks the authority to, quote, refine the definition of point source and non-point source pollution in a way that contradicts the intent of Congress. And in addition, Your Honor, the EPA's position lacks the force of law. It is not embodied in any regulation or any other level that the Christensen line of cases would require. What about Skidmore deference? Your Honor, if you were to give Skidmore deference, as the case law is clear, you look at the thoroughness of the analysis, the logic of the reasoning, and the consistency of the agency's statements and practices. EPA's brief fails on all three scores. The brief has ultimately no analysis. It is mere ipsy-dixit. It simply says, this is our position. It doesn't attempt to look at the legislative history, reconcile EPA's position with the 45-year history and Congress's intent. Well, I'm still trying to understand quite the, leaving aside that for a moment because your time is expiring. This effluent that's going into the wells is coming from a treatment plant, right? Correct. If the water had come, if the effluent had gone directly from the treatment plant into the ocean, there would be a point source and there would be. If there were a pipe running right to the ocean. And we would have no problem. That would be covered by the NPA. Definitely covered. Now, instead, it's going into wells. Correct. And the wells, there's evidence here that it leaks out of the wells and into the groundwater and into the ocean. In a diffused manner, yes. And so that doesn't count. The fact that it goes from the treatment plant to the ocean through a well means you're home free. That is the distinction Congress drew, Your Honor. That is how EPA understood this act when the Clean Water Act was enacted. As we pointed out in the supplemental filings, that is the position that government controlled. It's a matter that you know that the water, once it gets into the well, doesn't stop there. Correct. You don't think that Congress might have had in mind that when it goes into a well, it ends in the well. No. In the legislative history we cite, it was made clear to Congress that additions into the groundwater will get into the surface water. In fact, There were no scientific studies at the time the act was passed. Is that correct? That were introduced about how the effluent gets to the ocean? Well, I think there was no disagreement. Everybody agreed. Because there were no studies. No, everybody agreed that groundwater did, in fact, potentially or actually did, based on hydrogeology, cause contamination. It was cleared up, squared up, teed up to Congress. EPA's administrator came in and said, this will happen. If pollutants are put in groundwater, it will get into the surface water. Therefore, you must amend the program to extend it to this application, and Congress said no. Do you want to reserve your remaining time? I would. Thank you. May it please the Court. David Henkin, representing Plaintiffs' Appellees, Hawaii Wildlife Fund, Sierra Club Maui Group, Surfrider Foundation, and West Maui Preservation Association. Your Honors, as Judge Schroeder aptly put it, really the question in this case squarely presents the question whether the appellant can evade the Clean Water Act's permitting requirements simply because its discharges to the Pacific Ocean of millions of gallons of wastewater every day reach the ocean via hydrologically connected groundwater rather than an ocean outfall pipe. Before delving into the legal authorities that support the district court's opinion, I think it's important to have some perspective on the scope of the issue as it applies to the particular case before the court. We're dealing with four injection wells of the Lahaina Wastewater Reclamation Facility. Since 1982, every day the appellant has discharged millions of gallons of wastewater into those injection wells. When they designed the facility, including the injection wells, they knew that that wastewater had to go somewhere. In fact, you wouldn't design a facility to discharge millions of gallons of effluent every day if it wasn't going to go away. Otherwise, your injection wells would fill up. And the place where they knew that it would go would be to the Pacific Ocean. At the time, they didn't know exactly where it would go, but over the years, it became clear there was a serious problem here. So serious that researchers here at the University of Hawaii, as well as at the U.S. Geological Survey, did studies of the nearshore waters starting in 2007 and found that there was evidence that huge quantities of this wastewater was traveling through groundwater and getting to the very nearshore waters of the ocean near Kahikili Beach in West Maui. EPA, alarmed about this possibility, directed the county in 2010 to do a trace-or-die study. And subsequently, that study was carried out by various independent researchers who placed trace-or-die directly into the injection wells and observed where it came out. And they found, contrary to council's suggestion, that most of it came out in two very specific locations, called the North Seep Group and the South Seep Group. Throughout this proceeding, the county has sort of used the— Is that SEEP, for the benefit of our— SEEP. SEEP is S-E-E-P? S-E-E-P. My apologies if I didn't say it clearly. Throughout the proceeding, the county has used the scientist's lingo that 10% comes through specific identified seeps, in other words, little holes in the reef, and 90% is diffuse. It doesn't mean that it's diffuse throughout the entire area. Rather, as the record makes clear and we cited in our brief, there are specific areas where this wastewater is coming up literally through the reef. The trace-or-die study not only established conclusively the hydrologic connection between the injection wells and the ocean, but gave us some sense of the magnitude. They determined that there were literally— They were able to do an analysis to determine what percentage of the groundwater entering the ocean at Kahikili is due to their facility, and it is one out of every seven gallons. So we're dealing with a huge quantity of wastewater that's coming in, and while the appellant's expert tried to minimize that by saying, well, it's only nine liters per meter per minute, well, that's unintelligible to the general public. But what that means is a thousand gallons of wastewater entering the ocean every foot every day, a huge quantity, a huge problem. Your opposing counsel focuses on the intent of Congress at the time the act was passed. Yes, he does. In your answering, we've talked about Skidmore deference and Chevron deference to EPA's interpretation. Is that the argument you're making now? Well, Your Honor, hopefully in our brief and certainly today, we make several arguments. The first one focuses, as the district court did, on the language of the statute. And the court pointed out, as Justice Scalia did in his plurality opinion in Rapanos, that the Clean Water Act, in the language of the act, Congress does not talk about discharges directly to navigable waters from point sources, but rather discharges to navigable waters from point sources, and that distinction is critical. As Justice Scalia further explained, there are two different theories on which courts throughout the country have found- Sorry, you're talking about which case? Rapanos. Rapanos, that famous 441 case. It's a 441 case, yes, Your Honor. And Justice Scalia, however, was taking the narrowest view of what the scope of the Clean Water Act was. And in this particular portion of Rapanos, he was responding to a concern that was expressed by some that if you narrowly limited what could constitute a water of the United States, that somehow unscrupulous discharges would take advantage of that and would discharge into these waters that are not waters of the United States and thereby indirectly harm the navigable waters that are properly the focus of the Clean Water Act's concern. Justice Scalia responded to that saying, not at all, don't be alarmed, there's not a problem here because the act does not require, as the appellant would have it, a discharge directly to the navigable water from a point source, but rather, as the court has pointed out today, you need to have an identifiable, discernible point source from which pollutants flow. And the reason you want to do that is because, as this court's cases make clear, you want to be able to trace the pollutants from the point source to the navigable water. That is how the Clean Water Act accomplishes its goal of protecting the integrity of our nation's waters. Could I just back you up a little because a lot of this, I think we're all disheartened by the pollution that's going on. But we've got to step back on the statute. And counsel for Maui points us to 1314, which indicates when talking about non-point sources, and then it has that sub-F about wells. Yes, it does. Then, as you cite in your brief, you go to section 1362.14, in which point source can include, although you have various ellipses in there, a well from which pollutants are maybe discharged. Right. So how do we mesh those two definitions and sections? Because that, to me, you have to have the point source to get into all your other issues about whether it can go directly or indirectly and all that. So how do we interpret the Clean Water Act in light of those two sections? Well, thank you, Your Honor. There's no difficulty reconciling those two at all. Let's start with the definition of point source, both under the statute and under EPA's regulations. Both of them, there's a lot of ellipses because there's a lot of things that can constitute point sources. In fact, as the Court has constantly made clear, it's a broad definition, and the Clean Water Act wants to capture lots of things to make sure that we can protect our nation's waters, as long as it's identifiable, as long as it collects, as they do at their wastewater treatment plant, pollutants and then discharges them to navigable waters. Among them, it expressly says a well is a point source. And so you can't, you know, you can't read the statute in a way that their wells are not a point source. And in fact, below in the district court, it was undisputed at summary judgment, not once but twice, two rounds of summary judgment, that the wells are all point sources. Their quibbling was with whether it was a discharge directly from their point source into the navigable waters. And they took an extreme position that either it needs to be directly from their wastewater treatment plant, in other words, the plant would have to float on a barge over the ocean and discharge directly into the ocean, or it would have to pass through a series of point sources in order to get into the ocean. But you'd have connected dots in which it would go through point sources. And I'll get to that in a moment because, Your Honor, your question about this section 1314F, where it lists various things as non-point source and for the states to develop programs, this was dealt with by the Supreme Court in South Florida Water Management District, where it was likewise claimed that the movement of waters, if the movement of water is moving pollutants from one water body to another, that would be non-point source pollution. And it was argued there couldn't be a point source in that case where a pump station was pumping water from one part of the Everglades to another. And on page 106, the Supreme Court says, 1314F2F, that's the one having to do with movement of waters, does not explicitly exempt non-point sources from the NPDES program if they also fall within the point source definition. So, in other words, all movement of waters is not necessarily non-point source. It's only that non-point source movement of waters that would fall within this program, whereas a point source, like a pump, moving waters around would fall. Trustees for Alaska versus EPA, this court's opinion at page 557 through 558, rejected the argument that mining activities, which are also identified as non-point source, are exempt from NPDES permitting, saying, quote, another section of the act discusses non-point sources, which encompasses mining activities including runoff and siltation from new currently operating and abandoned surface underground mines. But they said in that case, the mining sluice box, it is a point source of mining activity. So there can be non-point source wells, and there can be point source well pollution. And that gets into this whole notion of that, you know, in Exxon versus Train, that court was dealing with a situation where there was no claim at all that the, you know, it said that the EPA doesn't have authority to regulate these discharges into deep wells, and in, I believe it's footnote one, they expressly said, we make this equation because neither party before us argues the disposal into wells at issue here is disposal into anything other than groundwater. Specifically, EPA has not argued that the waste disposed up into wells here do or might migrate from groundwaters back into surface waters that concededly are within its regulatory jurisdiction. And they reserve that question. The other cases that... Can I ask you again about Truss Seas? Yes. For Alaska? Yes. Doesn't, it said that point source pollution occurs when the pollution reaches the water through a confined, discrete conveyance, regardless of the kind of pollution at issue or the activity. Doesn't the pollution here reach the ocean through groundwater rather than the wells? Doesn't this significantly undermine the position that it's all the points are connected? Well, Your Honor, there's no question here that all the points are connected because in this case we have an extremely robust record where tracer dye was placed into the injection wells and it got out into the ocean. So we don't have any question of proof as there are in so many of these cases like McClellan ecological seepage situation where ultimately in the case that's reported in environmental law reporter, the court said there's no evidence, even though this gets into the groundwater, that it ever gets into a navigable water. This case is very different. It clearly gets into a navigable water, which then gets us back to Justice Scalia's interpretation and reading of the language in the Clean Water Act that prohibits a discharge to navigable waters from a point source, not a discharge directly to navigable waters. And Justice Scalia identified two lines of cases that exemplify that. Now one line of cases is this point source to point source to point source line of cases. But the other line of cases, and he cites one case in particular, which is concerned area residents for environment in Southview Farms. The Second Circuit case, and this was cited approvingly for this very proposition in a more recent Second Circuit case that the appellant also cites, the Cordiano case at 223 recognizes the same theory. So basically in concerned area residents for the environment, as Justice Scalia explains, there are two alternate theories of why there was a point source discharge when a farm employed liquid manure spreading vehicles on a field with the liquid manure running off of the field and running into the ocean. And the court was very clear in that case that there were two different bases on which it found a point source. The first one was that it ran across the fields through a berm and through a pipe and into the stream, at least in some location. And it said, well, that's a point source, even if it wasn't a point source discharge at the origin, it came into the water from a point source. And that's the theory they rely on. But it then clearly said, alternatively, the liquid manure spreading vehicles themselves are point sources. And so the fact that it originated in a point source and then got into the waters of the United States, that was all. And Justice Scalia made clear, and the case makes clear, that these are alternate bases for finding liability. And the district court rejected the contrary argument from the appellant, saying there'd be no point in saying that they're alternate theories if you also had to have every intervening thing be a point source. One of the arguments that's made here in one of the amicus briefs, I think in support of the county, is that if we adopt your definition that virtually every discharge into groundwater is going to require a permit and that you don't really have a cabining principle. I know you disagree with that, but how do you draw the line? It's quite simple, Your Honor. Traceability. And so if you look at League of Wilderness Defenders, if you look at Oregon Natural Desert Association, if you look at Trustees for Alaska, all of these cases uniformly talk about what non-point source pollution is. And they say it's characterized by the fact it's not traceable to any single discrete source. Now, Congress was not attempting, in writing the Clean Water Act, to give some loophole to polluters so that they could only find some way of, let's say instead of putting it into the groundwater, because back when they built this facility, they thought about building an ocean outfall. And they consciously chose, no, we're going to do injection wells, knowing full well it would get into the ocean. Now, if that can get them out of the Clean Water Act permitting, then why not, you know, here in Hawaii, if you go to the- You have here the studies that show, I don't know, something along the lines of 60% is traceable here. What if it was 1%? Would that still require a permit? Yes, Your Honor, because the Clean Water Act is a strict liability statute. So really the evidence is not, it doesn't tell you the answer to the question here. It might support it, but- The traceability is the important thing. But it wouldn't matter whether the traceability was .5 or 60. That would be our position, Your Honor. And because I may run out of time, when we're talking about hypotheticals here, you mentioned the hypothetical of putting the discharge facility right next to the ocean. We didn't argue this on appeal. It didn't come up. But below, we did argue to the district court that at the bottom of the injection wells, because they inject directly into the groundwater. This is not one of these cases where it percolates down into the groundwater. They inject directly into the data zone, directly into a saline groundwater, which is tidally influenced. So if for some reason the court's decision were to turn on that, and we respectfully suggest it should not, the district court record, and I don't have the site with me because I wasn't expecting this line of argument, there is a tidal influence to the groundwater. And if counsel has conceded that brings it within the Clean Water Act, well, I guess that's another way to get where we need to go. But let me understand. Help us write our opinion here. If you're writing the opinion, you say, well, if it's in the groundwater and it's traceable to the point source that you require a permit, but it's going into the wells, the argument, and the statute says that disposal of pollutants into wells does not require a permit. Now, you're writing our opinion. What do we say about that? Well, I think you say the same thing that the court said in Trustees for Alaska and the same thing that the Supreme Court said in South Florida, and, frankly, the Seventh Circuit, I believe, said in Inland Steel, all discharges are disposals, not all disposals are discharges. And this is critical. This is where EPA, it's not just their amicus brief, although with due respect, an amicus brief is plenty. That was plenty for Skidmore deference, but also for our deference. And I do want to really point out our deference here. You know, there are... A-U-E-R. A-U-E-R is spelling. Not our, but their. Yes. Their deference. I'll call it Robin's. Call it their deference. Robin's deference. Okay. There are several regulations that EPA has promulgated here. They've promulgated a regulation defining what is a discharge of a pollutant. That's at 122.2, and they use the language of the statute. They've promulgated a rule regulating concentrated animal feedlots. That was finalized in 2003, and even though in the final rule they didn't require a national standard for indirect discharges to navigable waters and groundwater, at page 68, Federal Register 7229, that's in our brief, they wanted to clarify that, you know, they didn't adopt a national rule because there's too much variability, but they said on a case-by-case basis you can impose NPDES permit requirements on a CAFO that discharges indirectly to groundwater. They said this when they did the Waters of the United States rule that's now a little bit up in the air in terms of its vitality, but nonetheless EPA cites in their brief the responses to comments in which they confirmed that a discharge to hydrologically connected groundwater is covered by NPDES permitting. All of these glosses on their regulations under our V. Robbins are controlling unless plainly erroneous or inconsistent with the regulation, and they rise to the level of Chevron deference, is how the courts treat them as the court explained in Pronsolino v. Nastry. So we not only have the language of the statute, which as Justice Scalia says is an indirect discharge, but we also have a more than 25-year of consistent EPA interpretation that the statute, their understanding of the statute is an expert agency, and so the highest Skidmore deference, but also their own regulations which touch on the subject, their glosses on that have emphasized that if you have an indirect discharge through the groundwater, you need to control that. Thank you. My time has expired. Thank you. Thank you very much. Your Honor, you asked how can you mesh these various provisions of the Act. I think you stand back and look at the big picture. All the other titles of the Clean Water Act mention groundwater, the Nonpoint Source Pollution Program, and the studies, the analysis, but in Title IV, the section that deals with the NPDES program, groundwater is not mentioned at all. Instead, with respect specifically to well disposal in Title IV, it appears in Section 1342B. The Act provides that a state must have programs to regulate well disposal in order to be delegated NPDES permitting authority. That provision would be superfluous if in 1342A, the NPDES program already applied to well disposal. And if you have any lingering doubt on this, Your Honor, the tiebreaker becomes the legislative history, which is uniform and points in only one direction. I'd like to mention Rapanos briefly because it came up. That case did not concern disposals to groundwater. It concerned whether ditches and creeks that are dry most of the year are navigable water. And in that opinion, Justice Scalia bewails the burden of the Clean Water Act on the public, criticizes the agencies and lower courts for expanding the Act's reach with no change in the language, and cautions against interpretations that upsets the federalism balance Congress drew. He wasn't speaking for a majority of the court. He wasn't speaking for a majority of the court, and it defies everything we know about Justice Scalia to believe that sub salientio, he was trying to overturn Congress's intent and rewrite the Clean Water Act after 45 years. Well, unfortunately, we can't ask him. But thank you for your argument. The case just argued, Hawaii Wildlife Fund v. Maui, is submitted. The court is adjourned, but we will now remain, and we're happy to answer questions. Of course, we will not answer any questions about the cases that we heard today or any other time during this week. If anybody needs to leave, please feel free to do so.
judges: Schroeder, D.W. Nelson, McKeown